1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

CINDY SALGADO,

                                    Plaintiff,

          v.

IQVIA, INC. and QUINTILES
COMMERCIAL US, INC.,

                                    Defendants.

Case No. 18-cv-2785-BAS-WVG

**ORDER:
(1) GRANTING IN PART AND
DENYING IN PART
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT; AND
(2) DENYING DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**[ECF Nos. 28, 29]**

     Presently before the Court are cross motions for partial summary judgment by Plaintiff Cindy Salgado and Defendants Quintiles Commercial U.S., Inc. and Iqvia Inc.  ("Def. Mot.," ECF No. 28, "Pl. Mot.," ECF No. 29.)  Both motions are opposed, ("Pl. Opp'n," ECF No. 33, "Def. Opp'n," ECF No. 34), and both have replies filed in support, ("Def. Reply," ECF No. 39, "Pl. Reply," ECF No. 37).  The Court finds resolution of these Motions is suitable without the need for oral argument.  *See* Civ. L.R. 7.1(d)(1).  For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion and **DENIES** Defendants' Motion.

**I.     BACKGROUND**

     Plaintiff began working for Quintiles Commercial U.S. Inc. on or about June

11, 2015.  (Joint Statement of Undisputed Material Facts, "JSUMF," ECF No. 38, at ¶ 1.)  In November 2017, following a merger, Quintiles became Iqvia, Inc.  (*Id.*)[1] Iqvia is a global provider of biopharmaceutical development and commercial outsourcing services.  ("Vick Decl.," ECF No. 28-2, ¶ 2.)  One of Iqvia's contracts for biopharmaceutical services is with AbbVie, Inc., a biopharmaceutical company involved in the research, development, marketing, and distribution of biopharmaceutical products, including Humira.  (*Id.* ¶¶ 2–3.)  Iqvia has a dedicated workforce to support patient outreach for AbbVie's Humira business.  (*Id.*)  The Humira project includes approximately 200 to 250 "Nurse Ambassadors" who train patients on administering their injections and provide patient care, paperwork help, and other services.  (*Id.* ¶¶ 3–8.)  There are about 29 to 30 District Managers who supervise, manage, and train the Nurse Ambassadors.  (*Id.* ¶ 8.)  At all times relevant to Plaintiff's Complaint, Iqvia utilized Unum Group ("Unum"), a third-party leave management service, to administer employees' leaves of absence. Unum evaluates eligibility for leave, tracks the leave, and ensures compliance with applicable law.  (Def. Opp'n at 4.)

On May 12, 2016, Plaintiff was promoted to the position of District Manager on the AbbVie/Humira Nurse Ambassador Project for the Southern California Region.  Plaintiff began working in that position on May 23, 2016.  (JSUMF ¶ 2.)  On May 25, 2017, Plaintiff began a leave of absence related to her pregnancy.  (*Id.* ¶ 3.)  Unum administered Plaintiff's leave and disability benefits.  (Def. Opp'n at 4.)  Plaintiff gave birth to her baby on July 23, 2017.  (JSUMF ¶ 4.)  Plaintiff's anticipated return date was November 25, 2017.  ("Compl.," ECF No. 1-1, at ¶ 14.)  In October 2017, Plaintiff began treatment for postpartum depression and postpartum anxiety.  (JSUMF ¶ 15.)  She was diagnosed with postpartum depression and received a doctor's note from Dr. Shahida Parveen to be placed off work through November 1,

---

[1] Following the lead of the parties, the Court refers to Defendants collectively as "Iqvia."

2017.  (Exhibit P, ECF No. 34-12.)  Plaintiff then received a second note to be placed off work until November 29, 2017, a third note to be off work until December 13, 2017, a fourth to be off work until December 29, 2017, and a fifth to be off work until January 10, 2018.  (Exhibits Q, R, S, and T, ECF No. 34-13 to 34-16.)

On January 8, 2018, Plaintiff sent Human Resources Specialist Christal Carmona an email, attaching a Work Status Note from her healthcare provider providing a return to work date and restrictions.  (Exhibit 14, ECF No. 29-16.) Plaintiff requested to return to work on January 16, 2018, working no more than 20 hours a week or 4 hours a day for the first and second week and working no more than 30 hours a week or 6 hours a day for the third and fourth weeks.  (*Id.*)

On January 11, 2018, Carmona sent Plaintiff an email stating that Iqvia was "unable to support the return to work accommodations" and suggesting that Plaintiff contact her doctor to see if there were any other solutions or schedules that could be provided. (JSUMF ¶ 8.)  The same day, Plaintiff responded saying she would follow up with her doctors and asked what modifications Iqvia could support.  (*Id.* ¶ 9.)  On January 12, 2018, Iqvia told Plaintiff her employment was terminated, effective that day.  (*Id.* ¶ 10.)  On January 16, 2018, Plaintiff received an email from Aliza Zaidi, the Associate Director of Human Resources, explaining the termination. The email stated Iqvia had received Plaintiff's requested work schedule, and "[a]t this time we are unable to accommodate this request, due [sic] critical business needs and needed to have someone working the territory on a full-time basis, as such we made the decision to terminate your employment . . . ." (Exhibit 18, ECF No. 29-16.)

In total, Plaintiff was on a pregnancy-related leave of absence from May 25, 2017 through January 12, 2018.  Plaintiff's leave consisted of leave provided for by California's Pregnancy Disability Leave Law, the California Family Rights Act, and the California Fair Employment Housing Act.  (JSUMF ¶ 6.)  Unum was responsible for determining whether Plaintiff was eligible for leave, and Iqvia relied on Unum's determinations.  ("Carmona Depo.," ECF No. 29-4, at 65:6–66:2; 93:2–16.)

In October 2018, Plaintiff filed suit for: (1) discrimination, (2) failure to accommodate, (3) failure to engage in the interactive process, (4) retaliation, (5) interference with leave and violations of California's Pregnancy Disability Leave Law, (6) interference with leave and violations of the California Family Rights Act, (7) failure to investigate and prevent discrimination, (8) wrongful termination in violation of public policy, (9) violation of California Labor Code section 1030.

Plaintiff moves for summary judgment on her first, second, third, sixth, and eighth causes of action. Iqvia moves for summary judgment on Plaintiff's punitive damages claim.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).  If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)).  Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita*, 475 U.S. at 587.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

## III.   ANALYSIS

### Plaintiff's Motion for Summary Judgment

### A.   Procedural Issues

Both parties have filed objections to certain pieces of evidence filed by the other.  To begin with, the Court notes that it does not consider the parties' relevance objections.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that various evidentiary objections, such as relevance, are redundant at the summary judgment stage where the court can award summary judgment only in the absence of a genuine issue of material fact based on evidence the contents of which must be admissible).  The Court addresses the remaining objections.

Iqvia objects to various pieces of evidence submitted by Plaintiff.  (ECF No. 35.)  Most objections are to portions of Plaintiff's declaration.  Upon review of the declaration, the Court finds it need not consider these objected-to portions of the declaration because the information is available through other documents.  For example, Plaintiff describes various communications between her and others, and the Court can review the documents without Plaintiff's description of the conversations. Iqvia also objects to one portion of the deposition of Krista Wall, wherein she testified that, in her opinion, AbbVie did not have any concerns regarding making an exception for Plaintiff in attending the national sales meeting in 2018 because Plaintiff was on a leave of absence.  (Exhibit 7, ECF No. 29-9, at 39:12–19.)  The Court finds Iqvia's objections to the statement (lacks personal knowledge, lacks foundation, and hearsay) are unfounded and overrules the objection.  Wall was discussing her own personal opinions and testifying to what she knew based on her position of employment.

Iqvia also objects to two of Plaintiff's exhibits, which are text message chains between Plaintiff and Candace Grover.  (ECF Nos. 29-13, 29-14.)  Ironically, Iqvia objects that the text messages lack foundation and authentication, but the text messages were authenticated by Plaintiff in her declaration—to which Iqvia also objected.  Plaintiff attests the text messages are true and correct copies of her message exchange with Grover.  Thus, they are authenticated.  The Court also disagrees with Iqvia's contention that the text messages are hearsay; the texts are not admitted for the truth of the matter asserted, but rather admitted to show that Plaintiff was communicating with Grover about her employment and leave.

Plaintiff objects to pieces of evidence Iqvia attached to its opposition.  (ECF No. 40.)  First, Plaintiff objects to the expert report of Dr. Matthew Carroll as hearsay. Generally, expert reports are inadmissible hearsay.  *See Hunt v. City of Portland*, 599 F. App'x. 620, 621 (9th Cir. 2009) (concluding that expert report was inadmissible hearsay); *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984)

(explaining that Federal Rule of Evidence 703 "does not allow the admission of [expert] reports to establish the truth of what they assert").  But "a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony," *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).  Dr. Carroll is a designated expert in this case and can testify to his opinions in trial, thus, the Court considers his expert report.

Plaintiff also objects to a December 2017 email between herself and her therapist.  She contends that the document does not stand for the proposition Iqvia cites it for. i.e., that Plaintiff did not introduce the issue of returning to work with her medical providers until December 27, 2017.  (*See* Def. Opp'n 7 n.4.)  This is not a true objection to the admission of the email as evidence but is a disagreement with Iqvia's argument.  An objection is not the proper procedure to contest an argument, instead, Plaintiff should simply respond to the argument.  Finally, the email is not hearsay because it was written by Plaintiff herself and thus admissible as a statement of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).[2]

The Court now turns to the merits of Plaintiff's Motion.

### B.   <u>Failure to Reasonably Accommodate</u>

Plaintiff brings a cause of action for failure make a reasonable accommodation.  The Fair Employment and Housing Act ("FEHA") makes it unlawful "for an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an applicant or employee."  Cal. Gov't Code § 12940(m).  The elements of a prima facie claim are: (1) the plaintiff has a disability covered by FEHA; (2) the plaintiff is qualified to perform the essential functions of the position; and (3) the employer failed to reasonably accommodate the plaintiff's disability.  *Scotch v. Art Inst. of Cal.-Orange Cnty., Inc.*, 173 Cal. App. 4th 986,

---

[2] As to Plaintiff's last objection regarding a June 2018 letter from Unum, (ECF No. 34-21), the Court did not consider the letter in its analysis of the Motions and thus the objection is moot.

1010 (2009).  An adverse employment action need not be shown, nor is any showing of a causal nexus between one's disability and an adverse employment action required.  *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 255–56 (2000).

## 1.    Disability

Plaintiff states she was disabled due to her pregnancy and the mental issues following her pregnancy.  (Pl. Mot at 7.)  A mental disability is defined as having "any mental or psychological disorder or condition . . . that limits a major life activity" such as working.  Cal. Gov't Code § 12926(j)(1).  A physical disability includes any physiological condition that affects certain body systems and limits a major life activity.  *Id.* at subsection (m).  The Code of Regulations state, "[a] woman is 'disabled by pregnancy' if, in the opinion of her health care provider, she is unable because of pregnancy to perform any one or more of the essential functions of her job or to perform any of these functions without undue risk to herself . . . [or she] needs to take time off for . . . post-partum depression."  Cal. Code. Regs, tit. 2 § 11035(f).  But "[t]o establish a prima facie case of failure to accommodate a physical disability under section 12940(m), plaintiff must first demonstrate that her pregnancy conditions constituted a physical disability within the meaning of the statute."  *Mayfield v. Trevors Store, Inc.*, No. C-04-1483 MHP, 2004 WL 2806175, at *5 (N.D. Cal. Dec. 6, 2004)

Iqvia concedes that there were periods of time during Plaintiff's pregnancy in which she was disabled, but it disputes that she suffered from a disability after October 5, 2017.  (Def. Opp'n at 12.)  Plaintiff produced doctor's notes showing a doctor diagnosed her with postpartum depression and opined that she was to be off work until January 10, 2018.  (Exhibits Q, R, S, T; ECF No. 34-13 to 34-16.)  In response, Iqvia produced Dr. Carroll's report.  Dr. Carroll reviewed Plaintiff's treatment records and conducted an Independent Medical Examination of Plaintiff in September 2019.  From this, he determined that the records do not demonstrate that Plaintiff had symptoms as of October 5, 2017 that would have resulted in an inability

to work.  (Exhibit L, ECF No. 34-8.)

The Court finds the notes from Plaintiff's doctor do not "conclusively establish" that Plaintiff was disabled but instead establish that the doctor "made certain diagnoses and recommended certain treatments."  *See Cortez v. Chipotle Mexican Grill, Inc.*, No. CV 17-4787-GW (JPRx), 2018 WL 6071093, at *10 (C.D. Cal. Aug. 9, 2018) (finding same).  A reasonable factfinder could find that Plaintiff was not disabled under the terms of the statute, in that she could still perform major life activities despite her pregnancy and despite the opinions of her doctor.  The Court also does not take Dr. Carroll's report as conclusive proof that Plaintiff was not disabled, as Carroll only reviewed past medical records and met with Plaintiff years after the relevant time period.  However, Carroll's report shows that a factfinder could look at all available medical information and determine that Plaintiff was not disabled.  Thus, the Court concludes that whether Plaintiff was disabled is a disputed issue of material fact.[3]

### 2.  Qualified to Perform Essential Functions

"Essential duties" are broadly defined as "the fundamental job duties of the employment position of the individual with a disability holds or desires."  Cal. Gov't Code § 12926(f)(1).  Determining the essential functions of a position requires a "highly fact-intensive inquiry."  *Lui v. City & Cnty. of San Francisco*, 211 Cal. App. 4th 962, 971 (2012).  Evidence of whether a particular function is essential includes, but is not limited to: the employer's judgment as to which functions are essential, written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, the

---

[3] Plaintiff also argues that if it is not determined that she was disabled, Iqvia perceived her as disabled.  (Pl. Mot. at 18 n.8); *see* Cal. Gov't Code § 12926(m)(4) (defining physical disability as "[b]eing regarded by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult").  In support of her argument, Plaintiff cites Vick's testimony that Iqvia took Plaintiff's request for accommodations at face value.  (Pl. Mot. at 18 n.8)  The Court disagrees that this one statement by Vick conclusively established that Iqvia perceived Plaintiff as having a physical disability.

1  consequences of not requiring the incumbent to perform the function, the terms of a

2  collective bargaining agreement, the work experiences of past incumbents in the job,

3  and the current work experience of incumbents in similar jobs.  Cal. Gov't Code

4  § 12926(f)(2).

5       Iqvia contends that "the essential functions of a District Manager include

6  attending mandatory meetings in Chicago and Florida in mid-January and early

7  February, as well as go through the 3-week [Initial Humira Ambassador Training

8  ("IHAT training")] customer-required, compliance-driven recertification process in

9  the first quarter of 2018 before she could return to the field."  (Def. Opp'n at 16.)

10      First turning to the IHAT trainings, Iqvia points to a document titled District

11  Manager Expectations for AbbVie Projects.  (Exhibit V, ECF No. 34-18.)   The

12  expectations provide that if an employee is out for more than three months, "re-

13  training with certification may take place upon return to the role."  (*Id.*)  Iqvia's

14  Senior Director, Business Unit Head, Michael Vick, testified to the same—that if an

15  employee is absent for more than three months, he or she is required to recertify.

16  ("Vick Depo.," ECF No. 28-5, at 53:15–25.)  To become recertified, the employee

17  attends IHAT training which is put on by AbbVie.  (*Id.* at 54:4–22.)  IHAT trainings

18  are offered quarterly in Chicago, Illinois.  (*Id.* at 60:8–16.)  The employee seeking to

19  become re-certified must attend the "true ambassador context portion" and the

20  "systems portion" of the training class which takes about three to four weeks.  (*Id.* at

21  54:16–55:1.)  The recertification is required because Iqvia's systems "become more

22  complex" over time and employees returning from a leave of absence may

23  "struggle[] to come in and perform at an appropriate level," for example, in

24  "compliance and how to enter the information for tracking into the system."  (*Id.* at

25  55:10–19.)

26      There are also two Regional Manager Meetings ("RMDM") per year.

27  ("Marucci Depo.," ECF No. 28-6, at 65:6–14.)   The RMDM "are mandatory

28  meetings for managers only, during which they are prepared to participate in the

coaching of and training of their team members during the National Sales Meetings ('NSM' or 'NXM'), where product launches and education are discussed." (Def. Opp'n at 3.)  At these meetings, District Managers "are trained to participate in the coaching of and training of their team members during the National Sales Meeting, where product launches and patient education are discussed." (*Id.* at 14.)  The RMDM and National Sales Meetings "usually last from 8:00 in the morning until 5:00, then [the employees] have a break from 5:00 to 5:30, and [they] have an activity at night from 6:30 usually until about 10:30." (Marucci Depo. at 148:5–16.)

When deciding whether to terminate Plaintiff, Vick testified that he and others evaluated the capacity of patient enrollments, and based on that capacity, "we needed somebody in a position . . . that could actually work to see patients almost effective immediately." (Vick Depo. at 84:7–25.)  Plaintiff "would not have been certified to see patients without traveling for training in the near future and would not have been able to attend the [RMDM]." (*Id.* at 85:13–17.)

Plaintiff does not seem to contest that the above are essential functions of the job, nor does she contest that she could not attend certain meetings full time. Plaintiff, by asking for a shorter workweek, acknowledged that she could not work a full 40-hour week.  Thus, this shows that she could not attend all-day meetings with evening events.  The Court need not determine whether these meetings were "essential functions" of the job, because, assuming they are, it appears that Plaintiff could have performed portions of these functions with accommodation, i.e., she could have worked a 6-hour day at the February conference (if she was able and willing to travel there.)  However, the issue is whether such an accommodation would have been "reasonable" under the circumstances.

### 3.    Reasonable Accommodation

"[A] woman disabled by pregnancy is entitled to the protections afforded any other disabled employee—a reasonable accommodation that does not impose an undue hardship on her employer." *Sanchez v. Swissport, Inc.*, 213 Cal. App. 4th

1331, 1339 (2013). "Reasonable accommodation" means a "modification or adjustment to the workplace that enables a disabled employee to perform the essential functions of the job held or desired." *Lui*, 211 Cal. App. 4th at 971. The term is defined in the FEHA regulations only by means of example. Reasonable accommodation

> may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

Cal. Gov't Code § 12926(p). The reasonableness of an accommodation is generally a question of fact. *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 n.11 (1999).

Plaintiff argues that Iqvia was unreasonable in not allowing her to work part time for a month before returning to work full time. But Iqvia points out that it already granted Plaintiff extensive leave, and it argues it was not required to provide any further accommodation. Plaintiff asks the Court to only look at her request for a modified January/February schedule in evaluating the reasonableness of the accommodation, (Pl. Reply at 1), but the Court must evaluate the situation as a whole. It would be inappropriate to view Plaintiff's one request in isolation and determine its reasonableness while ignoring the accommodations Iqvia had already granted. *See Joseph v. Target Corp.*, No. 2:12-CV-01962-KJM, 2015 WL 351444, at *12 (E.D. Cal. Jan. 23, 2015) ("Determining whether reasonable accommodation has been made is a fact-specific individualized inquiry that takes into account the totality of the circumstances.").

"FEHA does not obligate an employer to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks." *Raine v. City*

1    *of Burbank*, 135 Cal. App. 4th 1215, 1222 (2006).  "[A] finite leave can be a

2    reasonable accommodation under FEHA, provided it is likely that at the end of the

3    leave, the employee would be able to perform his or her duties."  *Hanson*, 74 Cal.

4    App. 4th at 226.  From Iqvia's perspective, Plaintiff had been granted extensive

5    leave, and having her work part time for another month would have made it difficult

6    or impossible for her to attend the required trainings and meetings.  Plaintiff had not

7    been able to attend the January RMDM.  (Pl. Mot. at 12.)  The National Sales Meeting

8    was set for February 5 to 8, 2018 and IHAT training was set for February 19 to March

9    23, 2018.  (*Id.*)

10         Whether it would have been reasonable for Iqvia to extend one further leave

11   to Plaintiff and allow her to work part time for a month is a question of fact that

12   cannot be decided at this stage.  For Iqiva to do so would have allowed Plaintiff to

13   skip all or part of the February 2018 sales meeting.  Plaintiff points out that her

14   replacement did not attend the February meeting, (*see* Marucci Depo. at 229:7–10),

15   but Iqvia could have reasonably thought that Plaintiff had missed enough work such

16   that it was essential for her to attend the meeting.  *See Nealy v. City of Santa Monica*,

17   234 Cal. App. 4th 359, 375 (2015) ("[E]limination of an essential function is not a

18   reasonable accommodation.").  Thus, whether or not it would have been reasonable

19   for Iqvia to make an exception for Plaintiff so that she was not required to attend all

20   or parts of the meeting is a disputed question of fact.  *See Nunes v. Wal-Mart Stores,*

21   *Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) ("In the summary judgment context, a court

22   should weigh the risks and alternatives, including possible hardships on the

23   employer, to determine whether a genuine issue of material fact exists as to the

24   reasonableness of the accommodation.").

25         Further, Plaintiff would have had to recertify through an IHAT training before

26   returning to the field, which would have caused more delay.  Michael Vick testified

27   that Plaintiff was terminated because of her "inability to either see patients in the

28   near future or to attend some of the national meetings."  (Vick Depo. at 85:1–3.)  If

Plaintiff was not re-certified, she would have not been able to work at all within the "nursing realm" or "within the district manager role." (*Id*. at 94:1–8.) She would not have been able to oversee nurse ambassadors in her district. (*Id*. at 95:20–96:2.) If she was not retrained in new documentation procedures, she would not be able to complete certain audits. (*Id*. at 96:9–17.) She also could not perform performance reviews for her team. (*Id*. at 97:3–8.) In sum, without attending the retraining and recertification process, she would not have been able to do the "three things" which form the primary role of a district manager (*Id*. at 97:9–13).

The IHAT training was to begin late February, approximately one week after Plaintiff stated she could begin working full time. But Iqvia argues it reasonably believed that Plaintiff may request further leave (as she had done previously) and therefore would not have been able to attend the recertification. (*See* Marucci Depo. at 119:24–220:3 ("We had concerns that maybe she would not come back. She was to come back on the 25th of November . . . and had pushed it forward, and so we were concerned from a . . . business perspective").) Indeed, it is unclear when Plaintiff originally intended to return. She informed Iqvia that she intended to return in November, but Kimberly Murdock, Plaintiff's co-manager for the region, testified regarding text messages between her and Plaintiff, where Plaintiff stated that she had an "original plan" of returning to work in January after the holidays. ("Murdock Depo.," ECF No. 28-8, at 113:6– 114:4.) Plaintiff also informed Merdock that her plan to return to work depended on childcare, as "she needed somebody to watch the baby when she went back to work." (*Id*. at 111:8–112:1, 115:9–14.) Iqvia argues that it was therefore Plaintiff's plan all along to take longer leave so she could care for her baby for the remainder of the calendar year, but neither party addresses whether Murdock shared this information with anyone at Iqvia such that Iqvia would have had these concerns when it terminated Plaintiff.

Considering the months of leave Plaintiff took and Plaintiff's further request to work part time, there is a genuine dispute of material fact as to whether Iqvia

reasonably accommodated Plaintiff. An issue of fact also exists as to whether the accommodation sought would have imposed an undue hardship on Iqvia. *See* Cal. Gov't Code § 12940(m) (an employer is to provide reasonable accommodation for an employee's known disability, unless the employer demonstrates that the accommodation would produce "undue hardship . . . to its operation").[4]  For the above reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment on her reasonable accommodation cause of action.

### C.   <u>Discrimination</u>

FEHA provides, in pertinent part, that it is an unlawful employment practice "[f]or an employer, because of the . . . physical disability . . . of any person, to refuse to hire or employ the person or . . . discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions or privileges of employment."   Cal. Gov't Code § 12940(a). A prima facie disability discrimination case requires that a plaintiff show that she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodation; and (3) was subjected to an adverse employment action because of the disability or perceived disability. *Wills v. Superior Court*, 195 Cal. App. 4th 143, 159–60 (2011). Plaintiff claims as a result of her "sex/pregnancy, need to breastfeed, disability, and/or perceived disability," Iqvia discriminated against her by, among other things, terminating her employment.  (Compl. ¶ 41.)[5]

---

[4] Plaintiff argues Iqvia waived the undue hardship affirmative defense because it did not raise undue hardship in its answer. Other courts have found that "the claim of 'undue hardship' is not a true affirmative defense that is waived if not pled." *Chou v. Potter*, No. CV 06-5683 GAF (RCX), 2009 WL 10674159, at *2 (C.D. Cal. June 12, 2009).  This is because it is part of the burden-shifting analysis, i.e., a plaintiff has the burden to establish "a case of disability discrimination, which includes a failure to reasonably accommodate, at which point the burden of production shifts to the defendant to show 'undue hardship.'" *Id*.  The Court agrees.

[5] In many discrimination cases, courts apply the three-stage burden shifting test set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell-Douglas*).  But "[t]he three-stage framework and the many principles adopted to guide its application do not apply in

1    The Court found above that whether Plaintiff was disabled and whether Iqvia

2    reasonably accommodated Plaintiff is a genuine issue of material fact that cannot be

3    decided at this stage.

4    As to the final element, the standard for determining whether an employee has

5    been subjected to "adverse employment action" is whether the employment action

6    materially affected "terms and conditions of employment," with that term being

7    liberally construed in order to afford employees "appropriate and generous protection

8    against employment discrimination." Cal. Gov't Code §§ 12940(a) and (h); *Yanowitz*

9    *v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1054 (2005). "[T]ermination, dissemination

10   of a negative employment reference, issuance of an undeserved negative

11   performance evaluation and refusal to consider for promotion" all constitute adverse

12   employment actions. *Brooks v. City of San Mateo*, 229 F.3d 917, 928–29 (9th Cir.

13   2000).

14   Plaintiff was terminated. Iqvia does not argue that there are any factual issues

15   as to whether Plaintiff was subjected to an adverse employment action. This element

16   is met. But because there are genuine issues of material fact that exist as to this cause

17   of action, the Court **DENIES** Plaintiff's Motion for Summary Judgment on her

18   discrimination cause of action.

19   **D.**    **Failure to Engage in the Interactive Process**

20   Under FEHA, an employer's failure "to engage in a timely, good faith,

21

22   discrimination cases where . . . the plaintiff presents direct evidence of the employer's motivation
     for the adverse employment action." *Wallace v. County of Stanislaus*, 245 Cal. App. 4th 109, 123

23   (2016). "[D]isability discrimination cases often involve direct evidence of the role of the

24   employee's actual or perceived disability in the employer's decision to implement an adverse
     employment action." *Id*. "Instead of litigating the employer's reasons for the action, the parties'

25   disputes in disability cases focus on whether the employee was able to perform essential job
     functions, whether there were reasonable accommodations that would have allowed the employee

26   to perform those functions, and whether a reasonable accommodation would have imposed an
     undue hardship on the employer." *Id*.

27   Here, it is undisputed that Iqvia terminated Plaintiff because it believed she was unable to

28   perform her critical job functions (which was a result of her disability), accordingly, the Court does
     not perform the *McDonnell-Douglas* analysis.

interactive process with the employee . . . to determine effective reasonable accommodations" is a violation of the statute. Cal. Gov't Code § 12940(n). FEHA imposes on employers a mandatory obligation to engage in the interactive process once an employee requests an accommodation for his or her disability, or when the employer itself recognizes the need for one. *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 (9th Cir. 2001). "Once initiated, the employer has a continuous obligation to engage in the interactive process in good faith." *Swanson v. Morongo Unif. Sch. Dist.*, 232 Cal. App. 4th 954, 971 (2014). The interactive process "requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identifying an accommodation that allows the employee to perform the job effectively." *Yeager v. Corr. Corp. of Am.*, 944 F. Supp. 2d 913, 919 (E.D. Cal. 2013). Whether the employer engages in an interactive process is a question of fact. *Wilson v. County of Orange*, 169 Cal. App. 4th 1185, 1193 (2009).

First, to prevail on this claim, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred. *Nealy*, 234 Cal. App. 4th at 379. Plaintiff has identified an accommodation—her modified work schedule for a month before returning to work full time. Whether or not this accommodation is reasonable in this situation is a disputed genuine issue of material fact, as noted above.

But even if an employer claims there is no available reasonable accommodation, "if it did not engage in a good faith interactive process, 'it cannot be known whether an alternative [accommodation] would have been found.'" *Wysinger v. Auto. Club of S. Cal.*, 157 Cal. App. 4th 413, 424–25 (2007). "The interactive process determines which accommodation is required. Indeed, the interactive process could reveal solutions that neither party envisioned." *Id.* at 425 (citations omitted). And, even if it is determined that Iqvia reasonably accommodated Plaintiff by extending her leave until January, it could still be

determined that Iqvia then "failed in its continuing duty to engage in the interactive process" following this. *See Perona v. Time Warner Cable*, No. EDCV-14-2501-MWF (SPx), 2016 WL 8941101, at *1 (C.D. Cal. Dec. 6, 2016); *see also A.M. v. Albertsons, LLC*, 178 Cal. App. 4th 455, 463–64 (2009) ("The failure to accommodate and the failure to engage in the interactive process are separate, independent claims involving different proof of facts.").

In *Swanson v. Morongo Unified School District*, an employee asked to switch from teaching fifth grade to second grade following her cancer diagnosis. 232 Cal. App. 4th 954. The employer instead assigned her to teach a kindergarten class. The court held that even if the employer accommodated the employee by switching her from fifth grade to kindergarten, it did not "engage in an ongoing dialogue regarding the accommodations [the employee] believed she needed to mitigate her . . . conditions." For example, the employer "offers no evidence to show it discussed with [the employee] the second grade assignment she sought or provided any explanation why it could not grant her request as a reasonable accommodation. To the contrary, the evidence shows the District simply assigned [her] to teach kindergarten and failed to engage in any further discussion with her." *Id.* at 972. "Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." *Id.*

Plaintiff points to various instances of Iqvia's failure to engage with her and keep her informed regarding her employment situation. For example, Plaintiff's job was posted to be filled in December 2017. (Marucci Depo. at 121:22–122:3.) Marucci testified that this was done because Iqvia was "unsure as to whether or not [Plaintiff] was going to return, based on her not coming back in November of 2017."

(*Id.* at 122:4–8.)  No one at Iqvia informed Plaintiff of the posting, and when she heard of it from a friend, she reached out to her supervisor Candace Grover saying that she saw her job had been posted and asking, "did I get fired?"  (Exhibit 11, ECF No. 29-13.)  Plaintiff testified that Grover told her the posting was "just a formality."  ("Salgado Depo.," ECF No. 29-11 at 215:7–10.)  Plaintiff states she was not reassured by this conversation, so she told Grover she intended to return, and Grover said, "If you're coming back, you're coming back.  And let us know what we can do to help you get back."  (*Id.* at 17–23.)  Grover testified that the job was posted "in case [Plaintiff] did not return. . . . [W]e wanted to identify candidates that . . . met criteria and eligibility and could possibly be ready to go in the event that [Plaintiff] didn't return to work."  (Grover Depo. at 95:21–96:21.)   There is no indication this information was relayed to Plaintiff; a company posting a job as a "formality" is different than one identifying potential candidates for a position held by an employee who intends to return.

Plaintiff testified when she brought up the idea of returning to work on a modified schedule, Grover said something like, "okay. Great" and did not express any concern.  (Salgado Depo. at 261:2–13.)  On December 19, Plaintiff emailed Carmona and told her she "was cleared to return to work on 1/11 on a modified work schedule to be up to full time hours by mid February."  (Exhibit 13, ECF No. 29-15.)  There is no indication Carmona responded to this.  On January 8, 2018, Plaintiff emailed Carmona and Grover a copy of a doctor's note placing her off work until January 15, 2020 with a modified work schedule for the following month.  (Exhibit 14, ECF No. 29-16.)   On January 11, Carmona advised Plaintiff that Iqvia was "unable to support your return to work accommodations.  At this time you will remain out on disability until you are able to return on a full time basis . . . It may be good to connect with doctor [sic] to discuss to see if there are any other solutions or schedules that can be provided."  (Exhibit 15, ECF No. 29-17.)  Plaintiff responded, asking, "What modifications can leadership/business support? I will discuss this

specifically with my doctor." (*Id.*)  There is no indication anyone responded to this email.  ("Salgado Decl.," ECF No. 29-3, ¶ 4; *see also* Carmona Depo. at 138:12–20 (Carmona testifying she does not recall if she responded to Plaintiff but if she had, it would have been over email)).  Plaintiff was terminated the next day.  Plaintiff then made a same-day appointment with her doctor and "obtained a clearance to return to work with no restrictions on January 13, 2018." (Salgado Decl. ¶ 5.)  She informed Iqvia of this, but she was not rehired.

Throughout her leave, Plaintiff made her position known to Iqvia.  She kept her employer informed of the extensions of her leave and informed Iqvia of her intent to return to work.  And up until January, it seems that Plaintiff and her supervisors were communicating often.  But this open dialogue ended.  *See Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 985 (2008) ("If the employer is responsible for a later breakdown in the process, it may be held liable [under section 12940(n)].").  When Plaintiff saw her job had been posted for hire, she reached out to ensure she would still have a job when she returned from leave.  She was assured she would, but was not told that Iqvia was identifying candidates to take her place in case she did not return.  Over time, she sent various doctor's notes extending her leave, and there is no indication Iqvia expressed an issue with these.  Iqvia now argues that Plaintiff was taking "indefinite" leave, (Def. Opp'n at 15) but there is no evidence that anyone at Iqvia informed Plaintiff that her leave was becoming unreasonable or too far extended.  There is no indication Iqvia warned Plaintiff that critical business needs were not being met and that she was needed at work, or that other employees were feeling burdened or stressed by her leave.  (*See* ECF No. 29-8 at 32:8–23 (Vick testifying that he does not know if anyone "specifically contacted [Plaintiff] to find out if" she could change her accommodations to attend the national sales meeting; "We took the accommodations from the position at their face value.").)  *See Swanson*, 232 Cal. App. 4th at 972 (taking issue with the fact that the employer did not "provide[] any explanation why it could not grant her request as a

reasonable accommodation").  And when Plaintiff requested a modified work schedule, Iqvia did not advise her as to why the schedule was unreasonable, nor did it ask her if she could change her schedule to attend meetings or events; instead, it terminated her.  And finally, when Plaintiff responded by obtaining clearance to work full-time, this did not change Iqvia's decision to terminate her.  Iqvia argues that the termination decision "could not be simply reversed" even after the doctor's clearance, (Def. Opp'n at 10) but does not explain this contention; there is no indication that someone had been immediately hired to replace Plaintiff or that anything would have stopped Iqvia from cancelling the termination due to Plaintiff's willingness to work full time.

In sum, Plaintiff "under[took] reasonable efforts to communicate [her] concerns" but the "breakdown in communication" occurred due to Iqvia.  *See Swanson*, 232 Cal. App. 4th at 972.  Plaintiff continuously expressed her desire and intent to return.  Iqvia now states it was concerned that Plaintiff was never going to return to work and that it believed that a modified work schedule was impossible or unreasonable, but this information was not communicated to Plaintiff.  "[I]nstead of sitting down with" Plaintiff to discuss her proposed plan, Iqvia effectively "slammed and locked the door."  *See Hernandez v. Rancho Santiago Com. College Dist.*, 22 Cal. App. 5th 1187, 1197 (2018).

The Court finds that Plaintiff has established there is no genuine issue of material fact that Iqvia failed to engage in the interactive process.  Iqvia did not raise a disputed fact.  Thus, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on this claim.

### E.    Violations of the California Family Rights Act

Plaintiff claims Iqvia violated the California Family Rights Act ("CFRA") by failing to designate and provide her with twelve weeks of leave.  (Pl. Mot. at 27.) Specifically, Plaintiff claims Iqvia (through Unum) failed to properly designate twenty-one days of her leave as job protected leave under the CFRA.  (*Id.*)

California has two separate statutory provisions providing for unpaid leave. The CFRA provides a right to a maximum of twelve weeks of unpaid leave in a twelve-month period.  Cal. Gov't Code § 12945.2(a).  The Pregnancy Disability Leave Law ("PDL") provides a right to "a female employee disabled by pregnancy, childbirth, or a related medical condition to take a leave for a reasonable period of time not to exceed four months and thereafter return to work." *Id.* § 12945(a)(1). "The right to take a pregnancy disability leave under Government Code section 12945 and these regulations is separate and distinct from the right to take leave under the" CFRA.  Cal. Code Regs. tit. 2, § 11046(a).  At the end of the employee's period(s) of pregnancy disability, or at the end of four months of pregnancy disability leave, whichever occurs first, a CFRA-eligible employee may request to take CFRA leave of up to twelve work weeks for reason of the birth of her child.  *Id.* at subsection (c).

A California regulation explains the interplay between the CFRA and the PDL: "The maximum statutory leave entitlement for California employees, provided they qualify for CFRA leave, for both pregnancy disability and CFRA leave for reason of the birth of a child and/or the employee's own serious health condition is the working days in 29 1/3 workweeks." Cal. Code Regs. tit. 2 § 11046(d).  The same regulation notes that to reach this maximum period, the CFRA leave must follow the PDL leave. *Id.* (explaining that PDL leave would be used for pregnancy and CFRA leave used after delivery).

Plaintiff contends that her leave was provided as follows:

May 25 to September 2, 2017: PDL leave
September 3 to October 4, 2017: CFRA leave
October 5 to 25, 2017: PDL and CFRA leave
October 26 to November 24, 2017: CFRA leave

(Pl. Mot. at 15.)  She takes issue with the October period where the PDL and CFRA leave periods ran concurrently.  Indeed, PDL leave is to run consecutively with CFRA leave.  *See* Cal. Code Regs. tit. 2 § 11046(d).  But, even if it is true that

portions of Plaintiff's leave period overlapped in October, Plaintiff took leave until January 12, 2018 (the day she was terminated).  (JSUMF ¶ 6.)  She argues, "at no point has IQVIA sought to designate any part of [her] leave from November 25, 2017 through January 15, [sic] 2018 as CFRA leave."  (Pl. Mot. at 28.)  But she does not point out what this leave was, if not CFRA.  In *Rincon v. American Federation of State, County, and Municipal Employees*, Case No. C 12-4158 MEJ, 2013 WL 4389460, at *13 (N.D. Cal. Aug. 13, 2013), the court held that if the plaintiff cannot show prejudice arising out of the employer's failure to inform her that her leave "would count against" her CFRA entitlement, she states no claim under CFRA.  The same is true here; there is no dispute that Plaintiff was granted more than 29 1/3 weeks of leave, which is more leave than CFRA and PDL allow.  Thus, she has not been prejudiced by Iqvia not officially designating the additional time as CFRA leave.  The Court **DENIES** Plaintiff's Motion for Summary Judgment for this cause of action.

### F. <u>Wrongful Termination in Violation of Public Policy</u>

Plaintiff contends that because she has established that she was terminated in violation of the FEHA and CFRA, she has a tort claim for wrongful termination in violation of public policy.  (Pl. Mot. at 29.)  Because the Court found disputed issues of material fact regarding Plaintiff's termination, as noted herein, the same applies to this cause of action.  *See Markowitz v. United Parcel Serv., Inc.*, 711 F. App'x 430, 431 (9th Cir. 2018) (holding the plaintiff's "claims for wrongful termination in violation of public policy fail for the same reasons that her underlying claims for disability discrimination" fail).  The Court **DENIES** Plaintiff's Motion for Summary Judgment for this cause of action.

### G. <u>Summary</u>

In sum, the Court grants Plaintiff's Motion for Summary Judgment on her claim of failure to engage in the interactive process.  The Court denies the remainder of her Motion.

**Iqvia's Motion for Summary Judgment**

A.   <u>Procedural Issues</u>

Plaintiff objects to various pieces of evidence Iqvia submitted in support of its Motion.  (ECF No. 36.)  Plaintiff first objects to various statements in Michael Vick's declaration.  ("Vick Decl.," ECF No. 28-2.)

Plaintiff objects to Vick's statement that the projects he oversees (AbbVie projects) constitute a "small percentage" of Iqvia's total business.  (*Id.* ¶¶ 5, 13.)  At his deposition, Vick testified that he had "no idea" what percentage of Iqvia revenue was made up of projects or contracts with AbbVie.  ("Vick Depo." ECF No. 33-5, at 60:5–7.)  These statements are contradictory.

Where a party proffers an affidavit that contradicts or seeks to explain earlier deposition testimony, the court must make a factual determination as to whether the declaration is an attempt to create a "sham" issue of fact and avoid summary judgment.  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991). An affidavit is not a sham if (1) it "merely elaborat[es] upon, explain[s] or clarif[ies] prior testimony[,]" *Messnick v. Horizon Indust., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995)); (2) if "the witness was confused at that time of the earlier testimony and provides an explanation for the confusion[,]"; or (3) if the declaration concerns newly discovered evidence.  *Pac. Ins. Co. v. Kent*, 120 F. Supp. 2d 1205, 1213 (C.D. Cal. 2000) (citing *Kennedy*, 952 F.2d at 266).  It is possible that after his deposition, Vick received new evidence regarding Iqvia's breakdown of business as it relates to the AbbVie projects, and then he included the information in his declaration based on his own personal knowledge.  Thus the Court does not find the declaration to be a sham produced merely to contradict the deposition testimony or avoid summary judgment.  The Court overrules Plaintiff's objection.

Plaintiff next objects to Vick's conclusory statements, (Vick Decl. ¶¶ 11, 14), which the Court addresses in its analysis below.  Plaintiff further objects to Vick's statement that Iqvia's corporate policies are established by corporate officers and the

Board of Directors.  Plaintiff claims Vick has no personal knowledge for this statement.  But Vick may testify as to his understanding of the organization.  *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) ("Personal knowledge may be inferred from a declarant's position.").  The Court overrules this objection.

Plaintiff also objects to various statements in the declaration of Aliza Zaidi. ("Zaidi Decl.," ECF No. 28-3.)  Plaintiff objects that certain statements by Zaidi are conclusory.  Again, the Court addresses the use of conclusory statements below.  As to Plaintiff's objections regarding Zaidi's lack of personal knowledge regarding the corporate structure and decisions of Iqvia, the Court again notes that Zaidi may make statements based on her understanding of the organization.  *In re Kaypro*, 218 F.3d at 1075.  The Court overrules Plaintiff's objections.

**B.**   **Punitive Damages**

Plaintiff's Complaint contains a request for punitive damages against Iqvia, and Iqvia moves for summary judgment on this issue.  Under California law, an employer may be liable for punitive damages based upon acts of an employee if the employer "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  Further, "[w]ith respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."  *Id.*

**1.**   **Managing Agent**

Iqvia contends that the decision to terminate Plaintiff was made by Michael Vick (who was in charge of the Humira project), and Aliza Zaidi (a human resources director).  (Def. Mot. at 11.)  Iqvia contends that neither of these individuals, nor anyone else involved in the decision, are "managing agents" of Iqvia.  (*Id.*)  It is essentially undisputed that neither of these individuals were officers or directors of Iqvia.  Thus, a triable issue on punitive damages could arise only if the evidence showed they were working for Iqvia in managing agent capacities.

– 25 –

"[B]y selecting the term 'managing agent,' and placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages." *White v. Ultramar, Inc*., 21 Cal.4th 563, 573 (1999).

> [T]he Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business.

*Id* at 577; *see Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167 (2000) (defining "corporate policy" as "the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations"). Whether employees exercise sufficient authority is determined on a case-by-case basis. *White*, 21 Cal. 4th at 567.

Iqvia has the initial burden to show there are no triable issues as to whether Vick and Zaidi (and any other managers or employees involved in Plaintiff's termination) were managing agents of Iqvia.

### a.    Michael Vick

Vick is a Senior Director, Business Unit Head for Iqvia. (Vick. Decl. ¶ 1.) Vick declares he has no "substantial independent authority and judgment in the Iqvia corporate decision-making process." (*Id.* ¶ 11.) This is simply a restatement of the rule from *White* and the Court cannot take this legal conclusion at face value. *See Davis v. Kiewit Pac. Co*., 220 Cal. App. 4th 358, 369 (2013) (holding a party "cannot

satisfy its initial burden of production of *evidence* by making a conclusory statement of *law*, whether directly or through a declaration of one of its employees"). The Court turns to the remainder of the declaration.

Vick describes his job and the portions of the company over which he has authority. He oversees Iqvia's relationship with one of its commercial clients: AbbVie, Inc. (Vick Decl. ¶ 3.) He only manages this one client relationship, which encompasses about 500 Iqvia employees (out of a total of 58,000 Iqvia employees worldwide). (*Id.* ¶¶ 5, 10, 13.) And "even within the realm of the AbbVie projects" he oversees, he states he does not have independent authority to determine corporate policy. (*Id.* ¶ 14.) He states he does not have authority to fire employees "without review and approval of an employees' direct supervisors in the project leadership, our legal department, human resources, my direct supervisor (Kirk Harmon), and other departments." (*Id.* ¶ 15.) The Court finds that Iqvia, through Vick's declaration which describes his job responsibilities and the nature and extent of his authority and discretion, has met its initial burden of showing that Vick was not a managing agent. *See Davis*, 220 Cal. App. 4th at 372.

In response, Plaintiff points to various depositions and to Iqvia's discovery responses. Anna Marucci testified that it is a written policy that if an employee is out for three months, he or she must attend IHAT training. (ECF No. 33-3, at 50:20–23.) Vick testified that he and Marucci, "with input from both the regional project leads as well as the client operational program[,]" made the decision to make this a policy. ("Vick Depo.," ECF No. 33-5, at 118:15–24.) This policy, which Vick had a role in forming and implementing, applies to all Humira patient ambassador employees. (*Id.*)

This shows that Vick had authority over, had a part in implementing policy covering, and supervised many employees as it relates to the AbbVie projects. His authority does not appear to extend outside of these projects. But, "California's appellate courts have made clear that conduct warranting punitive damages can be

imputed to a corporation even when the managing agent's authority was limited to only one or a few locations." *Garcia v. New Albertson's, Inc*., No. 2:13-CV-05941-CAS, 2014 WL 4978434, at *8 (C.D. Cal. Oct. 3, 2014).  In *White*, the supervisor

> was a "zone manager" responsible for overseeing operations of several convenience stores in the San Diego area.  As such, she was not a high-level manager or final policy maker for Ultramar, Inc. (Ultramar)—a large corporation that operates a chain of stores and gasoline service stations throughout California.  In effect, she was an [sic] local supervisor; indeed, according to the testimony of her supervisors, she apparently lacked the authority to terminate plaintiff without the approval of Ultramar's human resources manager and division manager. Nor did she purport to set any firm-wide or official policy concerning termination of employees for testifying at unemployment hearings. . . . [H]owever, she exercised authority that "necessarily result[ed] in the ad hoc formulation of policy" that adversely affected plaintiff.  Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another Ultramar employee.  A corporate manager with such authority may fairly be deemed a managing agent.

21 Cal.4th at 563; *see also Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 822–23 (1979) (imputing to a national insurance company the actions of a single office's manager).

Further, the fact that an employee "supervised a small percentage" of the defendant's employees is not sufficient to avoid trial on whether he was a managing agent.  *Garcia*, 2014 WL 4978434, at *8; *see also DesRosiers v. Hartford*, 979 F. Supp. 2d 1036, 1053 (E.D. Cal. 2013) (despite description "as a mid-level manager who supervised only about 100 employees, a small fraction of Hartford's 29,000 employees nationwide," and argument that "corporate policies are developed and authorized by its home office executives in Hartford," the question of "[w]hether or not [the employee] exercised ad hoc authority over Hartford policy requires a factual inquiry not suitable for summary judgment").  The same is true for Vick.

Next, Plaintiff presents evidence that shows whether or not Vick has authority to fire employees is debated.  Vick declares he does not have authority to fire anyone

without approval of others, including the legal and human resources departments. (Vick Decl. ¶ 15.)  But in its interrogatory responses, Iqvia stated that those involved in the decision to terminate Plaintiff were Michael Vick, Candace Grover, Anna Marucci and Aliza Zaidi. (Exhibit 31, ECF No. 33-6, at 5.)  The answer does not identify anyone in the legal department.  Thus, it is unclear to the Court just how much power Vick had over Plaintiff's termination and whether he was the most senior employee involved in the decision to terminate her.  And, as noted above, it appears that Vick had a major role in implementing a policy that affected a portion of Iqvia's employees.  Given all of these factors, Plaintiff has raised a disputed issue of fact as to whether Vick was a managing agent.

### b.   Aliza Zaidi

Aliza Zaidi is an Associate Director of Human Resources for Iqvia. (Zaidi Decl. ¶ 1.)  She is "responsible for overseeing human resources functions for human resources policy, compensation, benefits, and employee relations."  (*Id.* ¶ 3.)  She only oversees human resources functions for the employees in the division(s) to which she has been assigned.  (*Id.* ¶ 5.)  Like Vick, Zaidi declares that she does "not exercise substantial independent authority and judgment in this IQVIA corporate decision-making process" and lacks "authority to modify of develop" Iqvia's corporate policies.  (*Id.* ¶ 7.)  As the Court noted above, it cannot simply take these legal conclusions at face value.  *See Davis*, 220 Cal. App. 4th at 369.

The Court finds it has insufficient information to determine Zaidi's role and level of power within Iqvia.  She vaguely states she "oversee[s] human resources functions" for employees in certain groups. (Zaidi Decl. ¶ 4.)  Without further detail, it is unclear what this means.  Does this include creating human resources policies or implementing decisions?  The declaration does "not contain a sufficient description of [Zaidi's] job duties and responsibilities and the nature and extent of [her] authority and discretion, as well as [her] exercise of that authority and discretion, to support a reasonable inference that [she] did not 'exercise[ ] substantial discretionary authority

over [significant] aspects of [Iqvia's] business.'"  *See Davis*, 220 Cal. App. 4th at 372 (quoting *White*, 21 Cal.4th at 577).  Iqvia has not met its burden of establishing there is no disputed issue of material fact as to Zaidi's status and managing authority within the company.

### 2.  Analysis of Punitive Conduct

Assuming one of the above employees is found to be a managing agent, the Court turns to Plaintiff's argument of Iqvia's punitive conduct.

As evidence of Iqvia's malice, Plaintiff argues that Iqvia did not actually terminate her due to its stated reason of "critical business needs" because her replacement did not begin until after Plaintiff would have been released to work full time and thus the needs must not have been critical.  (Pl. Opp'n at 13.)  She also argues that Iqvia refused to engage in the interactive process with "conscious disregard" for her rights, did not grant her the full leave under CFRA, and posted her job while she was still on leave.  (*Id.* at 14.)

Because Plaintiff's FEHA claim for disability discrimination and her claim for failure to reasonably accommodate survive summary judgment, the Court finds it would be "premature to dismiss [her] request for punitive damages."  *See McInteer v. Ashley Distrib. Servs., Ltd.*, 40 F. Supp. 3d 1269, 1295 (C.D. Cal. 2014).  This is especially true because the Court has found for Plaintiff on her claim of Iqvia's failure to engage in an interactive process.  The Court therefore **DENIES** Iqvia's Motion for Summary Judgment.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment and **DENIES** Defendants' Motion for Summary Judgment.  Subject to the Order of the Chief Judge No. 24, *In re Matter of Extending Suspension of Jury Trials and Other Proceedings During the COVID-19 Public Emergency* (S.D. Cal. April 15, 2020), the Court orders the parties to contact the Magistrate Judge's chambers to reset their mandatory settlement

conference.  Upon conclusion of this conference, the parties shall coordinate with the

Magistrate Judge to set new dates for a pretrial conference and trial.

    **IT IS SO ORDERED.**

**DATED: May 8, 2020**

Hon. Cynthia Bashant
United States District Judge